IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

_____

ESTATE OF TYRESE WEST,
Deceased, by MONIQUE WEST and
DWIGHT PERSON, as
Special Administrators,

                                                Case No.:       19-CV-1843

              Plaintiffs,

v.

INV. ERIC GIESE and
VILLAGE OF MT. PLEASANT,
A Municipal Corporation,

              Defendants.

_____

## INV. ERIC GIESE AND VILLAGE OF MT. PLEASANT'S
## BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

_____

Defendants, Inv. Eric Giese and Village of Mt. Pleasant, by their attorneys, Crivello Carlson, S.C., respectfully submit this Brief in Support of their Motion for Summary Judgment.

## INTRODUCTION

This action brought under 42 U.S.C. § 1983 arises from tragic circumstances that took place on June 15, 2019, when Sgt. Eric Giese used deadly force after reasonably perceiving himself to be in imminent danger of death or great bodily harm by Tyrese West. In the seconds leading up to the use of deadly force, Mr. West did not comply with multiple verbal commands, continued to actively resist Sgt. Giese's efforts to take Mr. West into custody, and continued to reach for a loose firearm that that just was inches away during a tense physical struggle.

Plaintiff, the Estate of Tyrese West by its co-Special Administrators Monique West and Dwight Person ("the Estate"), alleges the following causes of action against Defendants: (1)

1

excessive force under the Fourth Amendment and 42 U.S.C. § 1983 against Eric Giese; (2) state-law wrongful death under Wis. Stat. § 895.03 against Eric Giese; and (3) state law indemnification against the Village of Mt. Pleasant, presumably under Wis. Stat. § 895.46. (Compl. 1–5, ECF No. 1.)

For the reasons explained more fully below, Defendants are entitled to judgment as a matter of law on all of the Estate's claims. First, the undisputed facts and established law in the Seventh Circuit show that Sgt. Giese's use of deadly force in seizing Mr. West was objectively reasonable under the Fourth Amendment as a matter of law. Second, alternatively, Sgt. Giese is entitled to qualified immunity on the Estate's Fourth Amendment claim because, at the very least, his use of deadly force against Mr. West did not violate clearly established law under these circumstances. Third, Defendants are entitled to judgment as a matter of law on the Estate's state-law claim, as Sgt. Giese is entitled to discretionary immunity. Fourth, the "indemnification" claim against the Village of Mt. Pleasant is not cognizable under Wisconsin law, and the Village must therefore be dismissed as a party-Defendant.

Accordingly, Defendants respectfully request that the Court grant their Motion for Summary Judgment and dismiss this action in its entirety, on the merits, and with prejudice.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

All undisputed, material facts necessary to support Defendants' Motion for Summary Judgment are contained in their Proposed Findings of Fact filed concurrently with this Brief. Defendants cite to some of those facts in summary and as relevant to their arguments below by referring to "DPFF."

On June 15, 2019, Sgt. Giese was the third shift commander for the Village of Mt. Pleasant Police Department ("MPPD"), starting his shift at 10:00 p.m. (DPFF ¶¶ 1, 6.) That

night, Sgt. Giese was driving a spare MPPD canine sports-utility vehicle ("squad" or "squad car"), and he was in uniform, wearing his full duty belt, which included two sets of handcuffs, a Taser™, a fixed blade knife, a baton, a handheld radio, two flashlights, and his service firearm. (DPFF ¶ 7.)  Sgt. Giese had a handheld radio because MPPD had just issued new radios, and he had not yet received his new lapel microphone.  (DPFF ¶ 8.)  His canine was with him in his squad.  (DPFF ¶ 9.)  As shift commander, Sgt. Giese's duties included filing a shift roster for the first shift to relieve the third shift, ensuring that everything was in order to pass to the next shift's roll call, supervising the five other officers on shift, and conducting his own patrol of the Village of Mt. Pleasant.  (DPFF ¶ 10.)

At approximately 1:30 a.m., while on patrol traveling eastbound on Highway 11 at the intersection with South Memorial Drive in the Village of Mt. Pleasant, Sgt. Giese observed an individual—who he would later learn was Tyrese West—riding a bicycle with no lights, traveling northbound.  (DPFF ¶ 11.)  In his deposition, Sgt. Giese testified that he was not aware of any prior contacts with Mr. West or his family.  (DPFF ¶ 12.)

In June 2019, section 347.489(1) of the Wisconsin Statutes prohibited any person from operating a bicycle on a highway, sidewalk, bicycle lane, or bicycle way during the hours of darkness unless the bicycle or operator was equipped with a lamp emitting a white light visible from a distance of at least 500 feet to the front of the bicycle.  Wis. Stat. § 347.489(1) (2017). Sgt. Giese observed that the bicycle was a mountain bike, and the operator wore dark clothing and jeans; Sgt. Giese could not tell whether the operator was male or female, and he was not able to tell the operator's race.  (DPFF ¶ 14.)

During his deposition, Sgt. Giese recalled his first thoughts when he observed the person operating the bicycle:

> The first thought being the time of day. We did have - - probably, like, four or five days later, we took a rash of vehicle thefts, thefts from vehicles throughout the village. Obviously, school just got out, spring break - - or not spring break, summer break and with that, we usually see an increase of thefts from vehicles and obviously, individuals, based on my training and experience, that ride bicycles, it's easy for them to avoid police detection. They go from area to area sometimes committing crimes and they also sometimes have contraband on them and obviously, at 1:30 in the morning, it is not a normal time where somebody is just out for a bicycle ride for fitness.

(DPFF ¶ 15.) Sgt. Giese also recalled that, in 2018, an individual riding a bicycle without a light was killed in a hit-and-run incident on that same highway. (DPFF ¶ 16.) Additionally, Sgt. Giese recalled that there had recently been a burglary involving an individual on a bicycle who stole a weapon in this same vicinity, which was a high-crime area in the Village. (DPFF ¶ 17.)

Having observed the rider without any lighting on the bicycle, Sgt. Giese decided that he wanted to speak to the individual for a field interview both based on the fact that the rider was in violation of state statute for operating the bicycle without any lights, and as a community caretaker function based on the risk involved with riding an unlit bicycle at 1:30 in the morning. (DPFF ¶ 18); Wis. Stat. § 347.489(1). According to defense expert Dr. John Black, Sgt. Giese's perceptions and observations of Mr. West in the moments when he first saw Mr. West on the bicycle were consistent with those of a reasonably well trained officer and current research relating to the attentional focus of law enforcement officers in similar contexts. (DPFF ¶ 19.)

The bicycle operator, Mr. West, was riding northbound on the sidewalk of Highway 32. (DPFF ¶ 20.) Sgt. Giese turned onto Highway 32 so that he was traveling the same direction as Mr. West, and pulled alongside Mr. West, activating his red and blue overhead lights and rolling down his passenger-side, front window. (DPFF ¶ 21.) Around that time, Sgt. Giese also notified dispatch that he was attempting to make contact with someone on a bicycle. (DPFF ¶ 22.) Sgt.

Giese drove next to Mr. West at approximately 10 miles per hour for approximately 400 yards from the intersection of Highways 32 and 11 to the intersection of 25th Street and Racine Street, during which time Sgt. Giese instructed Mr. West to stop three times. (DPFF ¶ 23.) Mr. West did not stop or look at Sgt. Giese, but instead began to pedal faster. (DPFF ¶ 24.)

Sgt. Giese also told Mr. West two or three times that he would release his canine if he did not stop, although Sgt. Giese did not release his canine and had no intention of doing so. (DPFF ¶ 25.) Mr. West did not stop, and Sgt. Giese notified dispatch that he was not stopping, stating, "Yeah, I don't know if he's gonna stop for me here," and, "He's not gonna stop." (DPFF ¶ 26.) After driving next to Mr. West for approximately 400 yards and multiple commands to stop, Sgt. Giese attempted to block Mr. West's travel using his squad, at which time Mr. West abandoned his bicycle and started running. (DPFF ¶ 27.) Sgt. Giese told dispatch, "he's running," exited his squad, and yelled "stop, police," pursuing Mr. West on foot. (DPFF ¶ 28.)

Based on Sgt. Giese's training and experience, when individuals run from law enforcement, they are typically the subject of warrants, or they are carrying contraband or weapons of some kind. (DPFF ¶ 29.) When Sgt. Giese first pursued Mr. West on foot, Mr. West was approximately 40 feet ahead of Sgt. Giese. (DPFF ¶ 30.) Mr. West was heading westbound on 25th Street towards a curve in Highway 32, also known as Sheridan Road. (DPFF ¶ 31.) Across Sheridan Road was a grassy area with a chain-link fence topped with barbed wire and between six and eight feet tall, abutting an industrial area. (DPFF ¶ 32.)

As Sgt. Giese pursued Mr. West, he said "stop, police" two more times. (DPFF ¶ 33.) Before Sgt. Giese and Mr. West arrived at Sheridan Road, Sgt. Giese began to close the distance between he and Mr. West. (DPFF ¶ 34.) As they ran, Sgt. Giese observed Mr. West reach with both hands to his waistband, which, based on Sgt. Giese's training and experience, led him to

5

believe that Mr. West was manipulating some kind of weapon. (DPFF ¶ 35.) In his deposition, Sgt. Giese recalled that this observation was "triggering" to him, in that "this isn't a normal foot pursuit to where individuals that are running away to where there was an actual - - there was an actual reaching toward the waistband." (DPFF ¶ 36.)

Dr. Black explains that a common "rule of thumb" for police officers is to "control the hands," by observing a subject's hands to confirm that they do not contain objects than can harm the officer, because hands (and objects in a subject's hands) can present threats of death or great bodily harm to officers at the most basic level. (DPFF ¶ 37.) While pursuing Mr. West, Sgt. Giese drew his Taser™ and deployed it at Mr. West, but it missed and was not effective in ending the pursuit. (DPFF ¶ 38.) Around the time he drew his Taser™, Sgt. Giese also pulled his handheld radio off of his belt with his left hand so that he could communicate with dispatch. (DPFF ¶ 39.)

Sgt. Giese continued running and dropped his Taser™, as he observed Mr. West start to "stumble" and, in Sgt. Giese's estimation, prepare to produce a weapon from his waistband. (DPFF ¶ 40.) Right after he dropped his Taser™, Sgt. Giese drew his firearm. (DPFF ¶ 41.) In addition to observing Mr. West running with both hands at his waistband, Sgt. Giese also observed Mr. West use what he identified as "target glances." (DPFF ¶ 42.) As defense expert Dr. John G. Peters, Jr. explains, "[a] 'target glance' is a looking back to see the position of the [law enforcement officer], which can aid the fleeing subject, in this case Mr. West, in choosing how to engage the [law enforcement officer] in either a physical fight or evaluate the [law enforcement officer] as a target for a weapon." (DPFF ¶ 43.)

According to Dr. Black, "[i]n potential use of force encounters, [police officers] seek[ ] critical information related to movement, weapons, indicators of intent, and similar that, when

aggregated, allows them to determine the level of threat . . . ."  (DPFF ¶ 44.)  After Sgt. Giese discharged his Taser™ and drew his firearm, Mr. West kept running while still reaching for his waistband.  (DPFF ¶ 45.)  Sgt. Giese was gaining on Mr. West, as Mr. West began to stumble and they neared the chain-link fence in the grassy area.  (DPFF ¶ 46.)

As they neared the fence, Sgt. Giese observed Mr. West stumbling and falling to the ground while simultaneously using both hands in an underhanded, tossing motion in a direction to Mr. West's front or right side, with an object "actually moving forward . . . ."  (DPFF ¶ 47.) Sgt. Giese heard a "distinct metallic clink" and then saw, for the first time, a firearm next to where Mr. West had fallen on the ground.  (DPFF ¶ 48.)  Although Sgt. Giese believes he heard the firearm hit the fence, he only saw where it landed on the ground and did not see where the firearm hit the fence.  (DPFF ¶ 49.)  Sgt. Giese does not know whether Mr. West or the firearm hit the ground first.  (DPFF ¶ 50.)  At the time Mr. West fell, Sgt. Giese was between approximately seven and ten feet away from Mr. West.  (DPFF ¶ 51.)

During his deposition, Sgt. Giese drew a line indicating the route of the foot pursuit from Sgt. Giese's squad, along 25th Street, across Sheridan Road, and to the point where Mr. West fell in the grassy area next to the chain-link fence:



(DPFF ¶ 52.)

After Mr. West fell to the ground, he was positioned with the front of his body facing the ground, the length of his body parallel and close to the chain-link fence, and Sgt. Giese estimated that the firearm came to rest between one and three inches away from Mr. West's left hand—approximately three feet from the fence with Mr. West between the firearm and the fence. (DPFF ¶ 53.)  As Mr. West was landing on the ground from his fall, Sgt. Giese caught up from behind with his radio in his left hand and his firearm in his right hand.  (DPFF ¶ 54.)  Sgt. Giese then stood over Mr. West, "straddl[ing]" him with his left foot on Mr. West's left hand-and-wrist area to stop him from reaching the firearm, and with his right foot near Mr. West's right side. (DPFF ¶ 55.)

Mr. West was resisting, moving, and attempting to get up to his knees, with his hands spread just outside his shoulder blades.  (DPFF ¶ 56.)  Sgt. Giese did not put his full weight on Mr. West's left hand for fear of losing his footing.  (DPFF ¶ 57.)  While he was straddling Mr. West, Sgt. Giese did not know whether Mr. West's stomach, torso, or rear-end were on or off the

8

ground.  (DPFF ¶ 58.)  Sgt. Giese testified that, while he straddled Mr. West, he was "laser focused" with "tunnel vision" on Mr. West's left hand and the firearm "because that was the immediate threat right there."  (DPFF ¶ 59.)

In his report, Dr. Black explains how high-stress situations can impact one's visual attention: "[t]he occurrence of selective visual attention (sometimes also referred to as tunnel vision) is a well-documented phenomenon.  Here the actor intensely focuses on one thing (to the detriment of not focusing on other information); usually the most important thing to them at the moment."  (DPFF ¶ 60.)  Dr. Black goes on to explain that "[m]ultiple studies have shown that the threatening stimuli attract one's attention and are particularly difficult to disengage from."  (DPFF ¶ 61.)  Dr. Black also notes that "an officer will most likely and with good reason maintain a singular attentional focus on specific cues when involved in a high-stress or survival type situation."  (DPFF ¶ 62.)

While Sgt. Giese straddled Mr. West, he gave verbal commands to stop moving, but Mr. West's hand was moving back and forth such that it appeared to Sgt. Giese that Mr. West was "going for the gun."  (DPFF ¶ 63.)  During this time, Sgt. Giese told Mr. West, "stop moving. Drop the gun.  Stop, or I'm going to shoot you.  I'm going to shoot you, mother-fucker."  (DPFF ¶ 64.)  During the struggle, Sgt. Giese told dispatch that Mr. West had a gun.  (DPFF ¶ 65.)  A portion of Sgt. Giese's verbal commands to Mr. West can also be heard on the audio recording with dispatch, where Sgt. Giese yells, "Drop the fucking gun or I'll shoot you!"  (DPFF ¶ 66.)

While Sgt. Giese straddled Mr. West, he also called out to dispatch to, "send me cover!" (DPFF ¶ 67.)  While Sgt. Giese straddled Mr. West, Mr. West continued moving his hand back and forth, struggling to free his left hand from Sgt. Giese's foot.  (DPFF ¶ 68.)  While the two struggled, Sgt. Giese was breathing heavily, stressed, and tired from the ongoing physical

struggle and from the previous foot pursuit. (DPFF ¶ 69.) Sgt. Giese did not hear Mr. West say anything to him during their encounter. (DPFF ¶ 70.)

Dr. Black explains how high-stress situations can impact one's auditory attention: "[a]nother well-documented phenomenon is that of auditory exclusion or diminished auditory perception. Here the actor may hear muffled sounds like a gunshot, a crash, or similar. In some cases, they may not even hear gunshots." (DPFF ¶ 71.) In his deposition, Sgt. Giese recalled, "I knew cover [officers were] coming and if he just would have just stopped, cover could have got there, we could have removed the weapon and he would have been taken into custody." (DPFF ¶ 72.) Sgt. Giese straddled Mr. West for approximately 10 to 12 seconds, until Mr. West freed his left hand from underneath Sgt. Giese's foot. (DPFF ¶ 73.)

Once Mr. West's left hand was unrestrained, Sgt. Giese believed that he no longer had control of the situation; Sgt. Giese felt that he could not completely disengage, he did not have physical cover, and he believed that Mr. West was going to grab the firearm and shoot Sgt. Giese. (DPFF ¶ 74.) As soon as Mr. West freed his hand from underneath Sgt. Giese's foot, Sgt. Giese pivoted backwards on his left foot to create distance, and fired his weapon three times, aiming at Mr. West's center mass. (DPFF ¶ 75.)

Sgt. Giese estimates that he fired all three rounds within .75 seconds or less. (DPFF ¶ 76.) In his deposition, Sgt. Giese could not recall exactly how Mr. West's body was positioned at the moment Sgt. Giese used deadly force, but he believed that Mr. West was moving. (DPFF ¶ 77.) Sgt. Giese pivoted clockwise, moving back over the firearm on the ground. (DPFF ¶ 78.) Sgt. Giese pivoted in an attempt to create distance and change his position so that he would not be an easy target. (DPFF ¶ 79.) He felt his only alternative was to use deadly force because, as he describes it:

> . . . I knew once I - - once I lost control of that left hand, I no
> longer had control of the situation, I no longer had - - maintained a
> position of advantage and therefore, the imminent threat criteria of
> the weapon, I wasn't able to disengage, there was no cover, that he
> was going to grab the weapon and shoot me.

(DPFF ¶ 80.)

While Mr. West was on the ground and before Sgt. Giese used deadly force, Sgt. Giese gave Mr. West between four and five verbal warnings. (DPFF ¶ 81.) Sgt. Giese stopped firing after three shots to reassess, and, because Mr. West had "slumped over," Sgt. Giese did not believe he was a threat any longer. (DPFF ¶ 82.) After Sgt. Giese fired three shots, Mr. West fell to his right side, toward the fence. (DPFF ¶ 83.) Sgt. Giese can be heard on the dispatch audio yelling, "Shots fired! Shots fired!" (DPFF ¶ 84.) Sgt. Giese estimates that backup officers arrived between approximately 30 seconds and one minute after he had fired the third shot. (DPFF ¶ 85.)

Assistant Medical Examiner Dr. Jessica Lelinski with the Milwaukee County Medical Examiner's Office performed the autopsy of Mr. West and determined that his cause of death was multiple gunshot wounds. (DPFF ¶ 86.) Mr. West was shot three times: two penetrating wounds (meaning the bullet entered the body and did not exit) in the left side of the forehead, and one perforating wound (meaning the bullet went all the way through the body) in the shoulder. (DPFF ¶ 87.) Dr. Lelinski's trajectory findings did not give her any indication as to where Sgt. Giese was located in relation to Mr. West at the time he sustained his wounds. (DPFF ¶ 88.) Approximately 82 seconds elapsed from the time that Sgt. Giese first told dispatch that he saw a bicyclist to the time that Sgt. Giese called out "shots fired" on the radio, and approximately 95 seconds elapsed from the time that Sgt. Giese told dispatch that he saw a bicyclist to the time that Sgt. Giese told dispatch, "I'm fine." (DPFF ¶ 89.)

**ARGUMENT**

**I.**     **Summary Judgment is Proper Under Fed. R. Civ. P. 56 if There are no Genuine Issues of Material Fact and Defendants are Entitled to Judgment as a Matter of Law.**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, establish that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The initial burden is on the moving party to demonstrate, with or without supporting affidavits, the absence of a genuine issue of material fact and that judgment as a matter of law should be granted to the movant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that is outcome-determinative of an issue in the case with substantive law identifying which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has met this initial burden, the opposing party must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 248. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* at 242. Nor will speculation, hearsay, or conclusory allegations suffice to defeat summary judgment. *Gobitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997); *see also Mills v. First Federal Savings & Loan*, 83 F.3d 833, 840 (7th Cir. 1996). The Court is "not required to draw every conceivable inference from the record, . . . and mere speculation or conjecture will not defeat a summary judgment motion." *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) (internal quotes and citations omitted).

Further, where the plaintiff in an excessive-force case seeks to avoid summary judgment solely by attacking an officer's credibility, the plaintiff must "provide specific evidence . . . such

12

as contradictory eyewitness accounts or other impeachment evidence." *Muhammed v. City of Chicago*, 316 F.3d 680, 683–84 (7th Cir. 2002); *Outlaw v. Newkirk*, 259 F.3d 833, 840–41 (7th Cir. 2001); *see also Jordan v. Howard*, 987 F.3d 537, 544–45 (6th Cir. 2021) (holding that officers' "supposed lack of credibility" and "the conclusions of [the plaintiff's] expert witness," Dr. Jeremy Bauer, were insufficient to avoid summary judgment in a deadly force case); *Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 406 (7th Cir. 1998) ("[T]he prospect of challenging a witness' credibility is not alone enough to avoid summary judgment."); *Corrugated Paper Products, Inc. v. Longview Fibre Co.*, 868 F.2d 908, 914 (7th Cir. 1989) ("The opposing party may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." (internal quotations and citations omitted)).

Moreover, to the extent a non-movant relies on expert testimony to avoid summary judgment, the expert's opinions are subject to all of the requirements under the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), such that speculative and conclusory expert testimony will not suffice to defeat a properly supported motion for summary judgment. *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106 (7th Cir. 1994); Fed. R. Evid. 702, 703; *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704–06 (7th Cir. 2009) ("[G]iven that the district court may consider the admissibility of expert testimony *sua sponte*, . . . it is of no import that [the movant] objected to the expert testimony only in its motion for summary judgment, as opposed to first filing a separate motion in limine."); *see also Jordan v. Howard*, 440 F. Supp. 3d 843, 857–58 (S.D. Ohio 2021) (holding that the opinions of plaintiff's expert, Dr. Jeremy Bauer, were too speculative and unreliable under *Daubert* to create a genuine issue of material fact in a deadly force case).

## II. Sgt. Eric Giese is Entitled to Judgment as a Matter of Law on Plaintiff's 42 U.S.C. § 1983 Claim of Excessive Force Because he Did Not Use Excessive Force in Violation of Tyrese West's Fourth Amendment Rights.

### A. The use of deadly force is objectively reasonable when an officer is faced with an imminent danger of death or serious bodily harm to themselves or others.

A claim that a law enforcement officer used excessive force in the course of a seizure of a citizen who is not in custody is analyzed under the Fourth Amendment's objective "reasonableness" standard. *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). The extent of the force used must be weighed against the need for administering it. *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985). In evaluating whether the use of force was reasonable, a court must first consider the nature and quality of the intrusion on the subject's Fourth Amendment rights and then determine whether the circumstances justified the use of force. *Id*. at 9.

The use of deadly force is justified if a police officer has probable cause to believe that a suspect's actions place him or her, or others, in imminent danger of death or serious bodily harm. *See Garner*, 471 U.S. at 9; *Muhammed*, 316 F.3d at 683. The reasonableness standard is objective such that the circumstances must be assessed from the perspective of a reasonable police officer on the scene rather than with the benefit of 20/20 hindsight. *Graham*, 490 U.S. at 397; *see also Tolliver v. City of Chicago*, 820 F.3d 237, 245 (7th Cir. 2016).

"If [a] suspect threatens the officer with a weapon, deadly force may be used." *Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018). More specifically, "there can be no question that [d]eadly force may be used if the officer has probable cause to believe that the armed suspect (1) poses a threat of serious physical harm, either to the officer or to others, or (2) committed a crime involving the infliction or threatened infliction of serious physical harm and is about to escape." *Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020) (internal quotations omitted).

14

Courts must allow officers some deference because they are often forced to make "split-second" decisions—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. *Graham*, 490 U.S. at 395. This reality is reflected in the fact that courts give considerable leeway to law enforcement officers' assessments about the appropriate use of force in dangerous situations. *Baird v. Renbarger*, 576 F.3d 340, 342 (7th Cir. 2009). "[T]he Fourth Amendment does not require omniscience . . . . Officers need not be absolutely sure . . . of the nature of the threat or the suspect's intent to cause them harm – the Constitution does not require that certitude precede the act of self protection." *Anderson v. Russell*, 247 F.3d 125, 132 (4th Cir. 2001) (citations omitted).

Further, in evaluating the reasonableness of officers' uses of force under *Graham*, the Seventh Circuit has been clear that courts "give no weight" to evidence that a law enforcement officer's use of force did not comply with the letter of their agencies' policies. *Estate of Biegert by Biegert v. Molitor*, 968 F.3d 693, 698–99 (7th Cir. 2020) ("Policies and procedures do not shed light on the reasonableness of an officer's behavior . . . ."). This is because "§ 1983 'protects plaintiffs from constitutional violations, not violations of state laws or, . . . departmental regulations and police practices." *Id.* at 699 (quoting *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003)). Moreover, as the Seventh Circuit has explained, "'even if [such policies] could be practicably assessed by a judge, [such policies] vary from place to place and from time to time,' and so '[w]e cannot accept that the search and seizure protections of the Fourth Amendment are so variable.'" *Id.* (quoting *Whren v. United States*, 517 U.S. 806, 815 (1996)).

15

**B. The Fourth Amendment does not require officers to wait for an armed subject to cause harm, first retreat for cover, or use less-lethal means before employing deadly force.**

The Seventh Circuit has explicitly held that when an individual has possession but not total control of a weapon, police officers cannot be expected to wait for that individual to achieve total control of the weapon before employing deadly force. *See Henning v. O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007); *see also Fitzgerald v. Santoro*, 707 F.3d 725, 731 (7th Cir. 2013) ("The police need not stand by when violence erupts and wait for a blow to render a victim unconscious, but rather may step in to prevent serious injury and restore order."). Other circuits have taken similar approaches. *See, e.g.*, *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001) ("The evidence establishes that immediately before [the officer] fired, [the suspect] was reaching toward what [the officer] believed to be a gun. Any reasonable officer in [his] position would have imminently feared for his safety and the safety of others."); *Thornton v. City of Columbus*, 727 F. App'x 829, 838 (6th Cir. 2018) ("The Officers also did not have to wait for [the suspect] to raise his weapon before employing deadly force."); *Jordan*, 987 F.3d at 544; *Parks v. Pomeroy*, 387 F.3d 949, 957–58 (8th Cir. 2004) (granting qualified immunity to an officer who used deadly force where a gun was "just inches" from the suspect's hand and the officer and suspect were involved in a "hostile and intense" physical struggle).

In *Henning*, the Seventh Circuit held that an officer did not violate the Fourth Amendment as a matter of law when he used deadly force against a resisting arrestee who, during a scuffle, officers believed may have had his hands on or near another officer's gun that fell out of its holster. 477 F.3d at 494, 496. When the defendant officers attempted to arrest Garrett Henning for a probation violation, Henning resisted arrest and, during the scuffle, one of the officer's guns fell out of its holster. *Id.* at 494. While the officer attempted to retrieve the

16

gun, "[h]e noticed that Henning's hand was under his body out of view and might be on the gun, and he shouted this to the other officers." *Id.* After a brief continued struggle, another officer, O'Leary, shot and killed Henning. *Id.* at 495.

In affirming the district court's dismissal of the plaintiffs' Fourth Amendment claim, the Seventh Circuit reasoned:

> Here, there can be no doubt that O'Leary had the requisite reasonable cause [to use deadly force]. In the tense struggle that followed Henning's refusal to submit to the officers' attempts to handcuff him, Peterson's gun got loose, and at least two officers believed Henning had his hands on **or near it**. **Police officers cannot be expected to wait until a resisting arrestee has a firm grip on a deadly weapon and completely freed himself from officers trying to subdue him before taking action to ensure their safety.**

*Id.* at 496 (emphasis added); *Conley-Eaglebear v. Miller*, No. 16–3065, 2017 WL 7116973, at *2 (7th Cir. Sep. 26, 2017) ("[The officer] did not need to wait for [the plaintiff] to face him or point the gun directly at him before acting to protect himself and the community."); *see also Tom v. Voida*, 963 F.2d 952, 954–55, 960–62 (7th Cir. 1992) (upholding summary judgment for officer who used deadly force after the officer pursued the subject on foot and engaged in multiple, violent physical struggles while trying to bring the subject into custody).

Moreover, the Seventh Circuit has made clear that the Fourth Amendment does not require officers to take cover prior to using deadly force when the *Graham* elements are satisfied. *Sanzone*, 884 F.3d at 740 (rejecting plaintiff's argument that the officer impermissibly escalated the encounter "before shooting by not taking cover"). Further, "*Graham* makes it clear that the Fourth Amendment does not require the use of alternatives before deadly force in a situation . . . when there is no time." *Id.* (internal quotes omitted; citing *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003); *Plakas v. Drinski*, 19 F.3d 1143, 1149 (7th Cir. 1994)).

17

**C.** **The undisputed facts show that Sgt. Giese's use of deadly force was objectively reasonable as a matter of law because, at the time he fired his weapon, he reasonably believed himself to be in imminent danger of death or great bodily harm.**

Sgt. Giese's encounter with Mr. West lasted no more than 95 seconds, and the nature of their encounter evolved rapidly as precipitated by Mr. West's continued refusal to comply with Sgt. Giese's lawful[1] commands. (DPFF ¶¶ 24, 26, 28, 33, 56, 63–64, 70, 89.) In a matter of seconds, the situational context of Sgt. Giese's contact with Mr. West shifted from routine field contact with someone violating a bicycle statute, to pursuing someone running from the police, to pursuing someone apparently in possession of a weapon, to physically engaging with someone actively resisting arrest while attempting to gain control of a loose firearm. (DPFF ¶ 104.) These rapidly evolving situational contexts increased in intensity and severity, culminating in the final ten-to-twelve seconds when it appeared to Sgt. Giese that Mr. West was attempting to gain control over a loose firearm to shoot Sgt. Giese.

At the moment Sgt. Giese lost control of Mr. West's left hand following the ten-to-twelve second struggle, Sgt. Giese knew that Mr. West had fled from a routine field interview at 1:30 in the morning, refused to respond to or comply with any orders to stop, produced a firearm from his waistband during a foot pursuit, used target glances to acquire Sgt. Giese's location, actively resisted Sgt. Giese's efforts to take him into custody with a loose firearm just inches away, and reached for the loose firearm. (DPFF ¶¶ 11, 24–26, 35–36, 40, 42–43, 48–49, 53, 56, 63, 73–74.) All of Mr. West's conduct in the previous 70 or 80 seconds reasonably led Sgt. Giese to believe that Mr. West intended to continue fleeing custody by any means necessary, including by gaining control of and using the loose firearm.

---

[1] The Estate has not alleged that Sgt. Giese acted unconstitutionally at any time during his encounter with Mr. West other than when he chose to use deadly force. *See generally* (Compl., ECF No. 1.)

18

Further, by reaching for the firearm while Sgt. Giese shouted commands to stop and called for cover from dispatch, (DPFF ¶¶ 66–69, 81), Mr. West's conduct only reinforced the reasonable belief in Sgt. Giese that Mr. West intended to gain control over the firearm and shoot Sgt. Giese in an effort to escape. As Dr. Black explains in his report, even subjects who are inexperienced with firearms and are in a prone position have the capacity to inflict serious bodily harm or even death on an officer in as little as half of a second. (DPFF ¶¶ 96–97.) *Henning*, 447 F.3d at 496, and *Conley-Eaglebear*, 2017 WL 7116973, at *2, both instruct that an officer in Sgt. Giese's position was not required to permit Mr. West to gain control over the loose firearm and wait for the event to play out, particularly where doing so followed a foot pursuit, physical confrontation, and multiple verbal warnings.

The tense, rapidly evolving nature of the incident placed Sgt. Giese in a reactionary position for the duration of his encounter with Mr. West, up to and including the final seconds before he used deadly force. As the defense experts explain, police officers experience a gap in time between their identification of a threat, processing the threat, and reacting to the threat of up to one third of a second or even half of a second. (DPFF ¶¶ 100–02.) In rapid, high-stress events, this so-called "reactionary gap" places officers at a disadvantage from a human factors perspective. (DPFF ¶ 103.) Dr. Black explains that "it would be reasonable to perceive a person in the prone position who can move as a lethal threat recognizing that by either having or acquiring a firearm, they would be able to use lethal force against another in approximately half a second." (DPFF ¶ 97.) Thus, at the moment Sgt. Giese lost control of Mr. West's left hand during their physical struggle, Sgt. Giese was quite literally left with fractions of a second to perceive, assess, and react to Mr. West's conduct.

During the intense ten-to-twelve seconds that Sgt. Giese tried to keep Mr. West from gaining control over the loose firearm, his attention was "laser focused" on Mr. West's left hand and firearm because that was the area where Sgt. Giese perceived an "immediate threat." (DPFF ¶ 59.) Sgt. Giese's experience comports with research in this area, as explained by Dr. Black:

> Research has shown that shifting attentional focus completely from one object to another can take anywhere between .20 and .60 seconds . . . with the needed time compounding as the complexity increases. This means that an officer will most likely and with good reason maintain a singular attentional focus on specific cues when involved in a high-stress or survival-type situation.

(DPFF ¶ 92.)

As such, when Sgt. Giese lost control of Mr. West's left hand—his central focus during the physical struggle—he did not perceive that he had only lost control of Mr. West's left hand, but rather that had he lost control of the entire situation. *See* (DPFF ¶¶ 74, 80.) Perceiving that he no longer had control over a fleeing, actively resistive subject who now had access to a firearm and recognizing that he could not disengage and did not have cover, Sgt. Giese felt that his only alternative to stop Mr. West from grabbing the firearm and shooting him was to use deadly force. (DPFF ¶ 80.) Sgt. Giese's decision to pivot in order to change his position and create distance also aligns with his stated perceived fear for his life. *See* (DPFF ¶ 79.)

Moreover, Dr. Black's and Dr. Peters' opinions show that Sgt. Giese's stated perceptions and decisions are consistent with human factors research and police practices standards in the areas of high-stress, use-of-force situations. Dr. Black opines:

> Sgt. Giese's perceptions and the subsequent choice options shifted and adjusted as the event progressed and the situational context evolved. As the event unfolded and Sgt. Giese's perceptions evolved, his attentional focus narrowed, and his choice options lessened as his perception shifted to that of dealing with a lethal threat. Sgt. Giese's perceptions are consistent with current research and generally accepted understandings within the

20

profession of policing. Sgt. Giese's perception of the situation, the threat he encountered, and the choices he perceived that were available to him are consistent with that of a reasonably well-trained police officer possessing a similar schema and understanding.

(DPFF ¶ 95.) Similarly, Dr. Peters opines that Sgt. Giese "followed nationally recognized threat assessment guidelines prior to his use of deadly force on Mr. West, which is consistent with generally accepted officer safety practices." (DPFF ¶ 98.) Further, Dr. Peters opines that "[t]he force used by Sergeant Giese on Mr. West was consistent with national training standards, national guidelines, national force standards, Wisconsin force guidelines, and Village of Mt. Pleasant Department *Use of Force* policy given the totality of the circumstances created by Mr. West." (DPFF ¶ 99.)

The outcome of Sgt. Giese's encounter with Mr. West resulted in a tragic loss of life. However, the undisputed evidence and clearly established law in the Seventh Circuit show that, as a matter of law, Sgt. Giese's use of deadly force was prompted by his reasonable belief that Mr. West's conduct posed an imminent threat of death or great bodily harm to Sgt. Giese. Sgt. Giese observed, interpreted, and reacted to a rapidly escalating encounter that led to a tense, physical struggle with a loose firearm just inches away from an actively resistive, fleeing suspect. Sgt. Giese was forced to make a "split-second" decision in uncertain circumstances—a situation where the Supreme Court has recognized the Fourth Amendment gives officers the ability to react in order to protect themselves from imminent threats of death or great bodily harm. *See Graham*, 490 U.S. at 395. Accordingly, Sgt. Giese's use of deadly force did not violate the Fourth Amendment as a matter of law.

21

**III.** **Alternatively, Eric Giese is Entitled to Qualified Immunity on Plaintiff's 42 U.S.C. § 1983 Claim of Excessive Force Under the Fourth Amendment.**

"Qualified immunity protects public servants from liability for reasonable mistakes made while performing their public duties." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013). One of the purposes of qualified immunity is to allow for reasonable errors "'because officials should not err always on the side of caution [for] fear [of] being sued.'" *Humphrey v. Staszek*, 148 F.3d 719, 727 (7th Cir. 1998) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)). The Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter*, 502 U.S. at 227.

For the Estate to defeat qualified immunity, it must show "(1) conduct violating [Tyrese West's] constitutional or statutory rights that is (2) clearly established at the time of the violation such that a reasonable official would understand that what he is doing violates that right." *Findlay*, 722 F.3d at 899 (internal quotations and citations omitted). The Court has the discretion to decide which prong to address first, and, "[i]f the answer to either question is no, [Sgt. Giese] is entitled to summary judgment." *Thompson v. Cope*, 900 F.3d 414, 420 (7th Cir. 2018). Thus, even if Sgt. Giese is found to have violated Tyrese West's Fourth Amendment rights, he is still shielded from liability "if the right was not clearly established at the time of the violation." *Findlay*, 722 F.3d at 899.

It is the Estate's burden to show that the law clearly established Tyrese West's Fourth Amendment rights in the context of the undisputed facts in June 2019. *See Findlay*, 722 F.3d at 899. To meet this burden, the Estate does not need to "point to an identical case finding the alleged violation unlawful, but existing precedent must have placed the statutory or constitutional question beyond debate." *Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017) (internal quotations and citations omitted). Only in "rare cases" might a plaintiff demonstrate

clearly established law just by showing that the alleged constitutional violation was "so egregious and unreasonable," or "patently obvious," that "no reasonable official could have thought he was acting lawfully." *Id.* at 351, 354 (internal alterations, quotations, and citations omitted).

"Before [the Court] can determine if the law was clearly established, 'the right allegedly violated must be defined at the appropriate level of specificity.'" *Kemp*, 877 F.3d at 351 (quoting *Wilson*, 526 U.S. at 615); *Weiland v. Loomis*, 938 F.3d 917, 919 (7th Cir. 2019) ("Over and over, the Supreme Court has held that a right is 'clearly established' only if it has been 'defined with specificity.'") (collecting cases). This means that "[c]learly established law 'must be "particularized" to the facts of the case.'" *Thompson*, 900 F.3d at 421 (quoting *White v. Pauly*, 580 U.S. ---, 137 S. Ct. 548, 552 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987))).

"The Supreme Court has expressly rejected over-general formulations of clearly established law in the Fourth Amendment context." *Kemp*, 877 F.3d at 352. For example, while "the Supreme Court addressed the constitutionality of excessive and deadly force" in the two landmark cases of *Garner*, 471 U.S. 1, and *Graham*, 490 U.S. 386, "the Supreme Court has made clear that *Garner* and *Graham* do not by themselves create clearly established law outside an obvious case." *Mason-Funk v. City of Neenah*, 895 F.3d 504, 508 (7th Cir. 2018) (internal quotations omitted). Within the last three years, the Court again reminded lower courts of the importance of specificity in excessive-force cases:

> **Specificity is especially important in the Fourth Amendment context**, where the Court has recognized that it is sometimes **difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts**. Use of excessive force is an area of the law in which the result depends very much on the facts of each case,

23

> and thus **police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue** . . . .

*City of Escondido, Cal. v. Emmons*, 586 U.S. ---, 139 S. Ct. 500, 503 (2019) (emphasis added; internal quotations and citations omitted); *City of Tahlequah, Oklahoma v. Bond*, 142 S. Ct. 9, 11 (2021) ("We have repeatedly told courts not to define clearly established law at too high a level of generality."); *see also Wonsey v. City of Chicago*, 940 F.3d 394, 400 (7th Cir. 2019) (citing and quoting *Emmons* as "reiterate[ing the Court's] 'settled principles'" on qualified immunity).

Here, the Estate cannot meet this exacting standard. As discussed above, existing Seventh Circuit precedent shows that Sgt. Giese was not constitutionally required to permit Mr. West to gain control over the loose firearm and point it directly at him before using deadly force. *Henning*, 477 F.3d at 496; *Conley-Eaglebear*, 2017 WL 7116973, at *2; *Tom*, 963 F.2d at 954–55, 960–62. Holdings in other circuits support this view. *See, e.g.*, *Parks*, 387 F.3d at 957–58 (8th Cir. 2004) (granting qualified immunity to an officer who used deadly force where a gun was "just inches" from the suspect's hand and the officer and suspect were involved in a "hostile and intense" physical struggle). In order to overcome qualified immunity, the Estate must present the Court with authority that "squarely governs" a situation where an officer uses deadly force following a physical struggle with a noncompliant, actively resistive, fleeing suspect who is attempting to gain control over a loose firearm. *See Emmons*, 139 S. Ct. at 503. Based on the holdings in the Seventh Circuit and beyond, the Estate is not able to present the Court with legal authority that places this constitutional question "beyond debate." *Kemp*, 877 F.3d at 351 (internal quotations and citations omitted).

Rather, qualified immunity is designed to shield police officers from civil liability for difficult decisions they must make in tense, dynamic, rapid, and unpredictable circumstances like

those that faced Sgt. Giese in June 2019. The undisputed facts show that Sgt. Giese was forced to quickly assess and react to escalating conduct presented by Mr. West in a high-crime area of the Village of Mt. Pleasant at around 1:30 a.m. (DPFF ¶¶ 17–18, 104.) As Sgt. Giese's encounter with Mr. West progressed, the intensity of the encounter increased to where Sgt. Giese found himself straddling Mr. West in an effort to prevent him from accessing the firearm previously produced from Mr. West's waistband and that unexpectedly landed within inches of Mr. West's hand. (DPFF ¶¶ 53, 55–56.) Having already exhausted the use of his Taser™ and called for backup on his radio, Sgt. Giese was faced with a split-second, difficult decision at the moment he lost control of Mr. West's left hand: whether to use deadly force or wait for Mr. West to grab the firearm. (DPFF ¶¶ 38, 41, 73–74.) Sgt. Giese's use of deadly force was preceded by four or five verbal warnings within the span of ten-to-twelve seconds, and those verbal commands were only met with continued active resistance. (DPFF ¶¶ 56, 70, 73–74, 80–81.) Feeling that he had no other alternative and that Mr. West was going to grab the firearm and shoot him, Sgt. Giese pivoted in an attempt to avoid being targeted and he discharged his weapon. (DPFF ¶¶ 74–75, 78–79.)

The doctrine of qualified immunity acknowledges the significant difficulty officers like Sgt. Giese face in making the decision to deadly force under such tense and rapid circumstances. Accordingly, in the event that Sgt. Giese is not entitled to judgment as a matter of law on the Estate's Fourth Amendment claim, he is alternatively entitled to qualified immunity.

## IV. Eric Giese and the Village of Mt. Pleasant are Entitled to Judgment as a Matter of Law on Plaintiff's Wrongful Death Claim Under Wisconsin Law.

Sgt. Giese is entitled to governmental immunity. Governmental immunity under Wisconsin law is "extremely broad." *Estate of Perry v. Wenzel*, 872 F.3d 439, 463 (7th Cir. 2017), *cert. den'd*, 138 S. Ct. 1440 (Apr. 2, 2018). Such immunity is committed to the

25

Wisconsin statutes at Wis. Stat. § 893.80(4). *See also Lodl v. Progressive Northern Ins. Co.*, 2002 WI 71, ¶ 20, 253 Wis. 2d 323, 646 N.W.2d 314. Wisconsin's governmental immunity "'provides that state officers and employees are immune from personal liability for injuries resulting from acts performed within the scope of their official duties.'" *Perry*, 872 F.3d at 462 (quoting *Pries v. McMillon*, 326 Wis. 2d 37, 784 N.W.2d 648, 654 (2010)). "Wisconsin courts have interpreted this protection as extending to all conduct involving 'the exercise of discretion and judgment.'" *Thomas v. Correctional Healthcare Companies, Inc.*, 15–CV–633–JPS, 2016 WL 7046795, at *4 (E.D. Wis. Dec. 2, 2016) (quoting *Milwaukee Metro Sewerage Dist. v. City of Milwaukee*, 277 Wis. 2d 635, 672, 691 N.W.2d 658 (2005)). "There are four exceptions to this broad doctrine: '(1) the performance of ministerial duties; (2) the performance of duties with respect to "known danger;" (3) actions involving medical discretion; and (4) actions that are 'malicious, willful, and intentional.'" *Perry*, 872 F.3d at 462 (quoting *Bicknese v. Sutula*, 260 Wis. 2d 713, 660 N.W.2d 289, 296 (2003)).

Here, Sgt. Giese is entitled to immunity under Wis. Stat. § 893.80(4) because none of these exceptions apply. Two of the exceptions can be disregarded immediately: the medical-discretion exception does not apply as there are no allegations in this case relating to medical care, and the undisputed facts are devoid of any evidence of malicious, willful, or intentional conduct by Sgt. Giese. Indeed, malice is not an element in Plaintiff's state law claim. *See* Wis. Stat. § 895.04; (Compl. at 3, ECF No. 1.)

Similarly, there is a fundamental lack of evidence showing the applicability of the known-danger exception. That exception is a "narrow, judicial-created exception that arises only when there exists a danger that is known and compelling enough to give rise to a ministerial duty on the part of a municipality or its officers." *Lodl*, 2002 WI 71, ¶ 4 (emphasis added). Here, the

26

known-danger exception is inapplicable because the fluid, quick, and dynamic nature of the situation highlights the degree of discretion at issue.

Finally, the ministerial-duty exception is inapplicable. In *Sheridan v. City of Janesville*, the Wisconsin Court of Appeals recognized that that the decisions that go into making an arrest, including the use of force, are discretionary, entitling officers to immunity under Section 893.80. 164 Wis. 2d 420, 427–28, 474 N.W.2d 799 (Ct. App. 1991). Similarly, the Eastern District previously held that "decisions by law enforcement officers concerning whether and how to arrest someone are discretionary for purposes of Section 893.80(4)." *Wilson v. City of Milwaukee*, 138 F. Supp. 2d 1126, 1130 (E.D. Wis. 2001); *see also Johnson v. City of Milwaukee*, 41 F. Supp. 2d 917, 932 (E.D. Wis. 1999); *Estate of Phillips*, 123 F.3d at 598–99. The complained-of conduct in this case, Sgt. Giese's use of force, is the quintessential type of conduct that is entitled to discretionary immunity.

Because none of the judicially created exceptions to Wis. Stat. § 893.80(4) governmental immunity apply in this case, Sgt. Giese is immune from Plaintiff's wrongful death claim. Sgt. Giese's conduct in attempting to take Mr. West into custody, including his use of deadly force, falls squarely within the ambit of discretionary immunity under Wisconsin law. Accordingly, the Court should grant summary judgment on Plaintiff's wrongful death claim.

**V.     The Village of Mt. Pleasant is Not a Proper Party to This Action.**

Plaintiff named the Village of Mt. Pleasant, Sgt. Giese's employer, as a party-Defendant solely for purposes of "indemnification" under Wis. Stat. § 895.46. (Compl. at 4, ECF No. 1.) Plaintiff does not allege—as it must in order to hold the Village liable under 42 U.S.C. § 1983— that one of the following caused a constitutional deprivation: "(1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially

authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cnty. Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2009) (citing *Monell v. Dep't of Soc. Svcs. of New York City*, 436 U.S. 658 (1978)); *Connick v. Thompson*, 563 U.S. 51, 60–61 (2011) (Local governments "are not vicariously liable under § 1983 for their employees' actions."). Further, Wis. Stat. § 895.46 "does not provide a private cause of action for indemnification" against the County, but instead "provides for the [municipality] to pay the damages[, if any,] on behalf of" the public officer or employee, by operation of law. *Jackson v. Graves*, No. 14-cv-1206-pp, 2015 WL 5577527, at *4 (E.D. Wis. Sep. 22, 2015) (citing *Miller v. Mauston Sch. Dist.*, 222 Wis. 2d 540, 550, 588 N.W.2d 305 (Ct. App. 1998); *Carlson v. Pepin Cnty.*, 167 Wis. 2d 345, 356, 481 N.W.2d 498 (Ct. App. 1992)). Accordingly, the Village of Mt. Pleasant is not a proper party to this action as a matter of law and should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants Sgt. Eric Giese and the Village of Mt. Pleasant respectfully request that the Court grant their Motion for Summary Judgment and dismiss this action in its entirety, on the merits, with prejudice, and with such costs and disbursements that the Court deems equitable.

Dated this 15th day of February, 2022.

By: s/ Benjamin A. Sparks
SAMUEL C. HALL JR.
State Bar No: 1045476
BENJAMIN A. SPARKS
State Bar No. 1092405
Attorney for Defendants, Eric Giese and Village
of Mt. Pleasant
CRIVELLO CARLSON, S.C.
710 N. Plankinton Avenue, Suite 500
Milwaukee, WI 53203
Ph: (414) 271-7722
Fax: (414) 271-4438
E-mail: shall@crivellocarlson.com
bsparks@crivellocarlson.com