IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
_____

ESTATE OF TYRESE WEST,
Deceased, by MONIQUE WEST and
DWIGHT PERSON, as
Special Administrators,

                                                  Case No.:      19-CV-1843

              Plaintiffs,

v.

INV. ERIC GIESE and
VILLAGE OF MT. PLEASANT,
A Municipal Corporation,

              Defendants.

_____

**ERIC GIESE AND VILLAGE OF MT. PLEASANT'S
REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**
_____

        Defendants, Eric Giese and Village of Mt. Pleasant, by their attorneys, Crivello Carlson, S.C., respectfully submit this Reply Brief in Support of their Motion for Summary Judgment.

**I.      There are no Genuine Disputes of Material Fact as to The Constitutionality of Sgt. Giese's Use of Deadly Force.**

        The Estate is correct that, "[t]o ensure fairness to a deceased plaintiff whose representative alleges an impermissible use of deadly force, given the impossibility of victim testimony to rebut the officers' account, [courts] scrutinize all the evidence to determine whether the officers' story is consistent with other known facts." *King v. Hendricks County Commissioners*, 954 F.3d 981, 985 (7th Cir. 2020); (Pl.'s Br. Opp. Mot. Summ. J. at 17–18, ECF No. 62 [hereinafter "Pl.'s Br."].)  However, this principle does not relieve plaintiffs from their burdens of proof at summary judgment, which requires evidence that rises above "speculation or

1

conjecture . . . create[ing] only metaphysical doubt and requir[ing courts] to make logical leaps rather than reasonable inferences." *Id.* at 986.

In *King*, the plaintiff, father of the decedent, "urge[d] that circumstantial evidence, including but not limited to the bullet trajectory, the lack of fingerprints on the knife, and the fact that [the decedent] was right-handed and thus probably would not have held the knife in his left hand, substantially undermine[d] the" account of the deputies who used deadly force. 954 F.3d at 983. Affirming the district court's grant of summary judgment, the Seventh Circuit "appreciate[d] the difficulty [the plaintiff] face[d] in countering the officers' testimony," but reasoned that the circumstantial evidence was too speculative to support the plaintiff's theory that the officers planted the knife on the decedent and fabricated the story that the decedent had charged at the officers, prompting their uses of deadly force. *Id.* at 985–86.

For example, in response to the plaintiff's contention that the knife lacked the decedent's fingerprints, the court explained:

> [The plaintiff] cannot make anything of the lack of fingerprint evidence: no evidence is no evidence. It is not affirmative evidence that contradicts the officers' testimony. We have previously warned in criminal cases that "successful development of latent prints on firearms is difficult to achieve." *United States v. Paladino*, 401 F.3d 471, 478 (7th Cir. 2005). "In reality, very few identifiable latent prints are found on firearms, a fact that has been discussed in both literature and the judicial system." *Id.* The same logic applies to knives used as weapons. And it is far too great a leap to infer from the lack of fingerprints on the knife that the police planted it after the shooting.

*Id.* at 986.

Here, the Estate relies on the same type of speculation and conjecture as the plaintiff in *King* in an effort to undermine Sgt. Giese's sworn testimony describing the incident. For instance, the Estate argues that "Tyrese's fingerprints were never established on the firearm,"

which, according to the Estate, "tends to further undercut the reliance that Tyrese ever possessed a gun, and allows the Plaintiff to put at issue before a reasonable jury the veracity of such claims." (Pl.'s Br. at 5.) Notwithstanding the Estate's failure to cite any proposed fact or evidence establishing the lack of fingerprints,[1] the Estate's theory falters in exactly the same way as the plaintiff in *King*: "no evidence is no evidence." 954 F.3d at 986. The Court should follow the reasoning in *King* and reject the Estate's invitation to make the leap in logic that the lack of fingerprints on the recovered firearm means that Mr. West never possessed it.

Moreover, the Estate's own admissions confirm that Mr. West was in possession of the firearm that fell within one-to-three inches of his grasp while he actively resisted Sgt. Giese. For example, the Estate has not disputed the following:

> After Mr. West fell to the ground, he was positioned with the front of his body facing the ground, the length of his body parallel and close to the chain-link fence, and Sgt. Giese estimated that the firearm came to rest between one and three inches away from Mr. West's left hand—approximately three feet from the fence with Mr. West between the firearm and the fence.

(Pl.'s Resp. PDFF ¶ 53, ECF No. 64.) This is just one of several of Defendants' Proposed Findings of Fact to which the Estate did not respond. *See* (*id.* ¶¶ 52–55, 92–94.) The Eastern District routinely deems undisputed properly supported proposed findings of fact that a party fails to respond to in accordance with local rules, even in cases involving parties not represented by counsel. Fed. R. Civ. P. 56(e); E.D. Wis. Civil L.R. 56(b)(2)(B)(i); *Burchard v. Johnson*, Case No. 20-C-306, 2020 WL 5602935, at *1 (E.D. Wis. Sep. 17, 2020) ("Because Plaintiff did

---

[1] The Estate's lack-of-fingerprints assertion is one of many unsupported factual contentions in the Estate's Brief, which also include, but are not limited to, "the fact that no bullets were within the firearm," the assertion that Mr. West had been "hanging out with his friends," and the assertion that "Tyrese would likely have to reach over his body to grab the firearm." (Pl.'s Br. at 1, 5–6.) The Court is not required to "scour the record looking for factual disputes," and "it is not required to scour the party's various submissions to piece together appropriate arguments." *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) (internal quotations omitted). As such, the Court should not consider any assertions in the Estate's Brief that are not properly supported by citations to the record, as required by Fed. R. Civ. P. 56(c), (e) and E.D. Wis. Civil L.R. 56(b)(6).

not respond to Defendant's proposed findings of fact, they are deemed admitted for the purposes of summary judgment."); *Salvadori v. Franklin School Dist.*, 293 F.3d 989, 992 (7th Cir. 2002) ("Because [the plaintiff] did not satisfy the local rule, the district court concluded that the defendants' proposed findings of fact were undisputed."); *Coleman v. Goodwill Industries of Southeastern Wisconsin, Inc.*, 423 F. App'x 642, 643 (7th Cir. 2011) (holding that the Seventh Circuit could not "conclude that the district court's decision to adhere strictly to the local rules— and require [the pro se plaintiff] to contest [the defendant's] proposed facts in the manner set forth by local rule—was an abuse of discretion.").

Similarly, some of the Estate's responses to Defendants' Proposed Findings of Fact are not supported by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A); E.D. Wis. Civil L.R. 56(b)(2)(B)(i). For instance, the Estate denies "that Mr. West freed his hand from underneath Sg. Giese's foot before Sgt. Giese pivoted" and fired his weapon. (Pl.'s Resp. DPFF ¶¶ 73, 75, ECF No. 64.) However, the Estate does not cite any evidence in support of these denials. (*Id.*) Similarly, in response to Defendants' proposed fact asserting that Mr. West "was resisting, moving, and attempting to get up to his knees, with his hands spread just outside his shoulder blades," the Estate simply responded, "Deny. Mr. West was not[.]" (*Id.* ¶ 56.) Again, the Estate does not cite any evidence in support of this denial. (*Id.*) The Court should deem these facts undisputed.

The Estate's failures to support its disputes of fact and its failures to respond to several of Defendants' Proposed Findings of Fact are not mere procedural oversights . The Seventh Circuit has repeatedly stated in no uncertain terms that "[s]ummary judgment is the proverbial put up or

shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021) (internal quotations omitted). The Estate's failure to respond to Defendants' Proposed Findings of Fact and its failure to support its factual assertions with citations to admissible evidence are clear indications that it does not have evidence "that would convince a trier of fact to accept its version of events." *Id.*

Further, even where the Estate cites to evidence in support of factual positions, a closer look at the cited evidence reveals that the positions rely on speculation and conjecture, or that the factual assertion itself is not material. Most notably, the Estate relies on the report and testimony of its expert, Dr. Jeremy Bauer. *See, e.g.*, (Defs.' Resp. PSOAF ¶¶ 16–17, 19, 22, 25.) However, certain opinions by Dr. Bauer—that Mr. West's hand was 12-to-18 inches from the firearm and he would have had to use 145 pounds of pulling force to free his hand from Sgt. Giese's foot—were not timely disclosed. (*Id.* ¶¶ 17, 22.) Dr. Bauer's other opinions are inadmissibly speculative and unreliable, just as the Southern District of Ohio found in *Jordan v. Howard* last year in another deadly force case. 440 F. Supp. 3d 843, 857–58 (S.D. Ohio 2021) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)), *aff'd*, 987 F.3d 537, 544–45 (6th Cir. 2021).[2]

In *Jordan*, the Southern District of Ohio held that Dr. Bauer's opinions were "not based on scientific, technical, or other specialized knowledge. Rather, his opinions [were] unsupported speculation." 440 F. Supp. 3d at 858 (citing *Daubert*, 509 U.S. at 592–93). In that case, Dr. Bauer analyzed "findings from the autopsy, locations of bullet holes and blood in [the

---

[2] "In performing its gatekeeper role under Rule 702 and *Daubert*, the district court must . . . determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Gopalratnam v. Hewlett-Packard Company*, 877 F.3d 771, 779 (7th Cir. 2017) (internal quotations and citations omitted).

decedent's] vehicle and testimony from Defendants about their locations and movements during the shooting[, concluding] that [the decedent] was not holding or gripping the gun when he was shot [by officers] in the right hand." *Id.* at 851–52. Reviewing Dr. Bauer's opinions, the court concluded that, "[b]ecause Bauer has no scientific basis for his opinions and his report only contains speculation as to what he thinks may have happened, this Court is unable to credit his conclusions." *Id.* at 858.

Dr. Bauer's role in this case is the same as it was in *Jordan*. While the Estate argues that "it cannot be assumed that [Dr. Bauer's opinions] are similarly deficient" in the *Jordan* case and the present case, (Pl.'s Br. at 4), Dr. Bauer admitted in his deposition that he approaches a ballistic or shooting incident reconstruction question using the same methodology, and he has used the same trajectory mapping process in his cases over the years. (Defs.' Resp. PSOAF ¶ 19.) Indeed, the similarity in his flawed methodology is apparent when comparing his report from *Jordan* to his report in the present case. *See* (*id.*)

Even absent the comparison to *Jordan*, Dr. Bauer's deposition testimony readily shows the lack of scientific methodology underlying his opinions. For example, the Estate relies on Dr. Bauer's opinions to support its contention that the loose firearm was never within one-to-three inches of Mr. West's hand while he was on the ground, straddled by Sgt. Giese. (Defs.' Resp. PSOAF ¶ 22.) However, in his deposition, Dr. Bauer admitted that he was not critical of and could not scientifically dispute findings in a report by Plaintiff's non-retained expert witness, Curt Freedman, stating that Mr. West could have tossed the firearm, hit the fence's top horizontal cross-bar, with the firearm bouncing approximately three feet away from the fence, just as Sgt. Giese testified. (*Id.*) In fact, Dr. Bauer—who has not been to the scene and has not conducted any testing—could not rule out the possibility that the firearm was within one-to-three inches of

Mr. West's left hand. (*Id.*) Thus, just as in *Jordan*, Dr. Bauer's opinion that the firearm was not within one-to-three inches of Mr. West's left hand boils down to an unsupported, speculative statement about Sgt. Giese's credibility—not a reliable source of contradictory evidence. *See Jordan*, 440 F. Supp. 3d at 858 ("A speculative expert report cannot be the basis to overcome summary judgment on qualified immunity and use of force.").

Similarly, the Estate relies on Dr. Bauer's opinions about bullet trajectory to support its assertion that the gunshot wounds on Mr. West were "in a downward trajectory." (Defs.' Resp. PSOAF ¶ 19.) At the outset, Dr. Bauer's trajectory opinions do not create a genuine dispute of material fact because, as he admitted in his deposition, his trajectory "findings were consistent with Officer Giese's testimony and claims in his interview testimony, and they are also consistent with the evidence produced and provided by the medical examiner"; he further admitted that "one of the purposes of [his] analysis was to determine whether Officer Giese's description of his position with respect to Mr. West's position is consistent with the physical evidence, and it was." (*Id.* ¶ 25.)

However, notwithstanding the apparent consistency between Dr. Bauer's findings and Sgt. Giese's testimony, Dr. Bauer's trajectory opinions are not relevant or reliable. The only material point in time under the Fourth Amendment analysis is "immediately prior to and at the very moment [Sgt. Giese] fired the fatal shot," *Ford v. Childers*, 855 F.2d 1271, 1275 (7th Cir. 1988), and Dr. Bauer openly admitted that his trajectory findings are scientifically incapable of providing any insights into those crucial moments.

Dr. Bauer's report contains three graphics—Figures 9, 13, and 15—which depict Mr. West as a 3D human surrogate and yellow cylinders on the outside of the 3D surrogate's body, which are intended to represent Dr. Bauer's mapping of the bullet trajectories—i.e., the paths of

7

the bullets in the air before they struck Mr. West. (Defs.' Resp. PSOAF ¶ 19.) Dr. Bauer created

the yellow cylinders solely by mapping the bullet wound paths—the bullets' paths within the

body—that he gathered simply by reading the autopsy report. (*Id.*)

Using free computer software, Dr. Bauer merely placed spherical markers (not to scale)

representing each bullets' entry, exit, or lodging place on the 3D surrogate, and then manually

placed yellow cylinders over the markers at angles of his choosing based on where he placed the

spherical markers. (*Id.*) In Dr. Bauer's words:

> I create a cylinder. I specify the diameter. I center one end of the
> cylinder to the center of the sphere that is the exit wound or the
> lodged bullet. I then rotate that cylinder until it passes through the
> center of the entry wound, and then, depending on the kind of
> wound, if it has an entry and exit, I will slide the cylinder along
> its . . . long axis so that we can see some yellow cylinder before the
> entry wound and after the exit wound.

(*Id.*) This is precisely the type of unscientific methodology Bauer applied and the court rejected

in *Jordan*. *See* (*id.*); *Jordan*, 440 F. Supp. 3d at 851–52, 857–58.

Further, the sole reference source cited in Dr. Bauer's report is an outdated version of a

book titled *Shooting Incident Reconstruction* by Michael Haag and Lucien Haag; at his

deposition, Dr. Bauer testified that he was unaware that his version of the Haags' book was out

of date by 11 years. (Defs.' Resp. PSOAF ¶ 19.) Despite his belief that the Haags' book is a

"commonly accepted handbook . . . of methodology for shooting reconstruction," Dr. Bauer did

not follow the Haags' method for calculating the mathematical components for trajectory. (*Id.*)

Similarly, contrary to the Haags' instruction in their book, Dr. Bauer did not take any of the

recommended steps to verify whether the autopsy photographs were taken from the appropriate

viewpoints such that he could accurately determine wound path and trajectory. (*Id.*) Thus, just

as the district court found in *Jordan*, Dr. Bauer's trajectory findings are not based on reliable, scientific methodology.

Most importantly, Dr. Bauer admitted that wound paths—the sole basis for his creation of the angles for the yellow cylinders depicting trajectory in his report—cannot allow him to opine to a reasonable degree of scientific or biomechanical certainty as to the positioning of Mr. West's and Sgt. Giese's bodies during the seconds or fractions of seconds before the bullets struck Mr. West, nor at the moment Sgt. Giese made the decision to use deadly force. (*Id.*) In other words, by his own admission, the sole basis for Dr. Bauer's trajectory findings does not provide any scientifically reliable insights about the moments "immediately prior to and at the very moment [Sgt. Giese] fired the fatal shot." *Ford*, 855 F.2d at 1275. Thus, even assuming reliable, scientific methodology formed the basis for Dr. Bauer's trajectory opinions, those opinions are not relevant to the Fourth Amendment inquiry.

Additionally, the Estate asserts that "Bauer concluded that the [*sic*] Giese's account of his 'physical struggle' with Tyrese is not consistent with the physical evidence of Tyrese's body." (Defs.' Resp. PSOAF ¶ 25.) To support this conclusory attack on Sgt. Giese's credibility, Dr. Bauer opines that, based on his review of the autopsy photos, he did not see evidence that Sgt. Giese's boot was in contact with Mr. West's left hand, as Sgt. Giese testified. *See* (*id.*) However, this observation is deficient in the same way as the Estate's lack-of-fingerprints assertion: "no evidence is no evidence." *King*, 954 F.3d at 983. Moreover, Dr. Bauer admitted that he did not have any reason to believe that there was not a physical struggle between Mr. West and Sgt. Giese, and he could not rule out the potential that long grass or weeds obstructed Sgt. Giese's foot as he tried to pin down Mr. West's left hand. (*Id.*) Thus, just as with his other

9

opinions, Dr. Bauer simply submits conclusory, metaphysical doubts about Sgt. Giese's description of the physical struggle without pointing to evidence in support of his opinions.

Further, by failing to respond to Defendant's Proposed Findings of Fact, the Estate already conceded the following:

> Sgt. Giese then stood over Mr. West, "straddl[ing]" him with his left foot on Mr. West's left hand-and-wrist area to stop him from reaching the firearm, and with his right foot near Mr. West's right side.
>
> . . . .
>
> Mr. West was resisting, moving, and attempting to get up to his knees, with his hands spread just outside his shoulder blades.

(Pl.'s Resp. DPFF ¶¶ 55, 56, ECF No. 64) (emphasis added); Fed. R. Civ. P. 56(e); E.D. Wis. Civil L.R. 56(b)(2)(B)(i); *Burchard*, 2020 WL 5602935, at \*1; *Salvadori*, 293 F.3d at 992. These concessions and the conclusory, unscientific nature of Dr. Bauer's opinions illustrate the Estate's inability to create genuine disputes of material fact as to Sgt. Giese's description of the physical struggle.

In sum, while the Estate faced an admittedly difficult task in refuting Sgt. Giese's sworn testimony, the Estate's admissions and reliance on inadmissible expert opinions leave its theory of the incident—that Mr. West never possessed a firearm, Sgt. Giese never physically struggled with him, and Sgt. Giese used deadly force for no reason—firmly in the realm of speculation and conjecture. Just as in *King*, the Estate has not presented the Court with any admissible, non-speculative evidence that disputes Sgt. Giese's account of the incident or that would provide a jury with a properly supported alternative theory. The Estate cannot avoid summary judgment simply by raising "the prospect of challenging a witness' credibility," as it has attempted to do here. *Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 406 (7th Cir. 1998). Thus, because the

Estate has failed to create a genuine issue of material fact, the Court should grant Defendants' Motion for Summary Judgment.

## II. The Estate Has Not Overcome Qualified Immunity Because it Has Not Shown That Sgt. Giese's Use of Deadly Force Violated Clearly Established Law.

The Estate primarily relies on *Estate of Smith by Haynes v. City of Milwaukee, Wisconsin*, 410 F. Supp. 3d 1066 (E.D. Wis. 2019), in arguing that Sgt. Giese is not entitled to judgment as a matter of law or qualified immunity. (Pl.'s Br. at 13–16, 20.) However, *Smith*, which was decided after Sgt. Giese's encounter with Mr. West, is not instructive here. *See* (DPFF ¶ 1, ECF No. 53); *Smith*, 410 F. Supp. 3d at 1066 (Oct. 18, 2019); *see also Werner v. Wall*, 836 F.3d 751, 761 (7th Cir. 2016) (framing the qualified immunity inquiry as "determine[ing] whether the contours of the right involved were clearly established at the time of the defendants' actions"). First, unlike the present case, the plaintiff in *Smith* presented evidence that the decedent threw the firearm over the fence and thus did not have physical access to the weapon before any officer used deadly force. *Smith*, 410 F. Supp. 3d at 1069–70. Second, the first shot that struck the decedent was in his bicep and caused him to fall to the ground, initially subduing him. *Id.* at 1172–73. The court acknowledged that, "[w]hatever reasonable arguments that could be had as to the first shot," the second, fatal shot occurred while the decedent "was in an incredibly vulnerable position: he was unarmed, on his back, hands above his head, with his palms open," and had just been shot in the arm. *Id.* at 1073. Third, there was a question of fact as to whether the officers gave *any* verbal warnings prior to using deadly force. *Id.* at 1070.

Further, the plaintiff did not need to rely on speculative expert testimony to construct the plaintiff's version of events, as there were multiple body camera angles showing what happened. *See id.* As such, the court needed only to refer to the video footage in finding that a jury would have to decide the reasonableness of the force. *Id.* at 1073–74 ("What is clear from the footage

(from both officers' body cameras) is that [the decedent] was prone and subdued in the moments leading up to [the officer] pulling the trigger for the second shot.").

By contrast, here, the Estate has not presented admissible evidence of a different version of the events than those described by Sgt. Giese. Unlike in *Smith*, the firearm Mr. West had in his possession was not on the other side of a fence, and Mr. West was not on his back with his palms facing Sgt. Giese after he had already been shot. Rather, the firearm came to rest between one and three inches from Mr. West's left hand, as West was resisting, moving, and attempting to get up to his knees, struggling against Sgt. Giese. (DPFF ¶¶ 53, 56, ECF No. 53.) Moreover, unlike the officers in *Smith*, it is undisputed that Sgt. Giese gave Mr. West between four and five verbal warnings before using deadly force. (*Id.* ¶¶ 64, 66, 81.) Despite these verbal warnings, West's hand continued moving back and forth such that it appeared to Sgt. Giese that Mr. West was "going for the gun" just inches away. (*Id.* ¶ 63.)

Notably different from *Smith*, Sgt. Giese's decision to use deadly force came in the split-seconds when Mr. West freed his left hand and had direct access to a loose firearm. Unlike in *Smith* where the fatal shot occurred nearly two seconds after the decedent had already been shot in the arm and did not have access to the firearm he threw over the fence, 410 F. Supp. 3d at 1069–70, 1073–74, Sgt. Giese's decision to use deadly force was made in the fractions of seconds when West's active resistance led to his direct access to a loose firearm, (DPFF ¶¶ 53, 56, 63, 74–75, ECF No. 53.) And unlike the officers in *Smith*, who arguably had a constitutional obligation to reassess after shooting the decedent in the arm, *see* 410 F. Supp. 3d at 1073, Sgt. Giese waited to use deadly force until the threat he perceived was imminent and he felt that he had no alternative means of protection. When Mr. West freed his left hand, Sgt. Giese believed that he no longer had control of the situation; he felt that he could not completely disengage, he

did not have physical cover, and, based on West's active resistance in light of multiple verbal commands, he believed that West was going to grab the firearm and shoot him. (*Id.* ¶¶ 53, 56, 64, 66, 74, 81.) Thus, *Smith*'s important factual distinctions make it unhelpful here.

While the Estate attempts to dispute Sgt. Giese's testimony that he felt his only alternative was to use deadly force at the moment West freed his left hand from under Sgt. Giese's foot, the Estate cites only to the following testimony from Sgt. Giese:

> Q: And you could have knocked him upside the head with the gun. Correct? You could have.
>
> A: I guess I could have.
>
> Q: But you didn't.
>
> A: I did not.

(Pl.'s Resp. DPFF ¶ 80, ECF No. 64.) The Estate's implicit suggestion that Sgt. Giese should have struck Mr. West in the head with his service weapon cuts against their own position, as "[t]he Seventh Circuit has held that a blow to the head with a closed fist or with an object can constitute deadly force." *White v. City of Racine*, Case No. 14-cv-1122-pp, 2017 WL 1030714, at *9 (E.D. Wis. Mar. 15, 2017) (citing *Sallenger v. Oakes*, 473 F.3d 731, 740 (7th Cir. 2007)). If, according to the Estate, the circumstances facing Sgt. Giese before West's hand was free gave him the constitutional requisite for a blow to the head with his weapon, then the circumstances facing him after West's hand was free gave him the constitutional requisite for deadly force.

Additionally, cases holding that an officer may not use deadly force against a subject merely because the subject is in possession of a weapon are not instructive based on the undisputed facts present here. *See* (Pl.'s Br. at 7, 12, 14, 17–18.) For instance, in *Weinmann v. McClone*, the plaintiff was sitting in a lawn chair, alone, in his garage, until the officer kicked in the door in response to reports that the plaintiff was suicidal. 787 F.3d 444, 446–47, 449 (7th

13

Cir. 2015). There was a dispute of fact—conflicting eyewitness testimony from the plaintiff and defendant—as to whether or not the plaintiff pointed his firearm at the officer. *Id.* at 446–47, 450. Thus, *Weinmann* and similar cases from outside the Seventh Circuit stand for little more than the unremarkable proposition that a subject's mere possession of a weapon does not justify an officer's use of deadly force. However, given the undisputed facts in the record, that proposition is not instructive here.

The undisputed facts show that, at the moment Sgt. Giese used deadly force, he had just been engaged in a 10-to-12 second physical struggle with West, where West's active resistance allowed him to free his hand from under Sgt. Giese's foot just inches away from a loose firearm. (Pl.'s Resp. DPFF ¶¶ 11, 24–26, 35–36, 40, 42–43, 48–49, 53–59, 63–70, 74–81, ECF No. 64.) Sgt. Giese gave West multiple verbal commands, but West continued to actively resist in an attempt to free his left hand. (*Id.*) At the moment West's hand became free from underneath Sgt. Giese's foot, Sgt. Giese was forced to make a split-second decision with a loose firearm within the reach of a subject who previously fled from him, gave target glances during the pursuit, actively resisted, and appeared to be attempting to recover the firearm. (*Id.*) Given the undisputed facts in the record, this case falls much closer to cases like *Henning v. O'Leary*, 477 F.3d 492 (7th Cir. 2007), *Conley-Eaglebear v. Miller*, No. 16–3065, 2017 WL 7116973 (7th Cir. Sep. 26, 2017), *Tom v. Voida*, 963 F.2d 952 (7th Cir. 1992), where officers were forced to make split-second decisions amidst physical struggles with subjects before those subjects actually pointed a weapon at the officers, *see* (Defs.' Br. Supp. Mot. Summ. J. at 16–17, ECF No. 52.)

Thus, the Estate has not only failed to create a genuine issue of material fact, but it has also failed to refute Sgt. Giese's entitlement to judgment as a matter of law. The undisputed facts in the record show that this case is readily distinguishable from the cases on which the

14

Estate relies, and the clearly established law at the time of this incident did not require Sgt. Giese to wait for Mr. West to gain full control of and use the loose firearm prior to protecting himself with deadly force. At the very least, the Estate has failed to show that Sgt. Giese's conduct violated clearly established law such that, at minimum, he is entitled to qualified immunity. Accordingly, the Court should grant Defendants' Motion for Summary Judgment.

## III. The Estate Has Not Overcome Discretionary Immunity.

In its Brief,[3] the Estate appears to conflate the qualified immunity defense under federal law with the discretionary immunity defense under Wisconsin law. *See* (Pl.'s Br. at 19–21.) Notwithstanding this confusion, the Estate relies on an unpublished case from the Western District of Wisconsin, contending that the Court should apply the fourth exception to discretionary immunity for "malicious, willful and intentional" conduct. (Pl.'s Br. at 21) (citing *Geboy v. Oneida County*, 19-cv-574-bbc, 2020 WL 7398660, at *9–*10 (W.D. Wis. Dec. 17, 2020)). In *Geboy*, the Western District expressly acknowledged that the "there is some question in the case law whether the exception applies to negligence claims, for which intent is not an element." 2020 WL 7398660, at *9. The court further noted that the Eastern District has held that the exception "does not apply" to negligence claims for excessive force as a matter of law. *Id.* at *10 (citing *Wilson v. City of Milwaukee*, 138 F. Supp. 2d 1126, 1133 (E.D. Wis. 2001)).

The Estate has not presented the Court with evidence or binding legal authority showing that it should change course from the settled rationale in *Wilson*. There is no evidence whatsoever showing that Sgt. Giese acted with malice or any culpability approaching recklessness; rather, the undisputed evidence shows that Sgt. Giese reasonably believed that he was faced with an imminent threat of death or great bodily harm. (Pl.'s Resp. DPFF ¶¶ 11, 24–

---

[3] The Estate did not respond to Defendants' argument that the Village of Mt. Pleasant should be dismissed, and therefore the Estate waives such claims and arguments. *See* (Defs.' Br. Supp. Mot. Summ. J. at 27–28, ECF No. 52); *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012).

26, 35–36, 40, 42–43, 48–49, 53–59, 63–70, 74–81, ECF No. 64.) Accordingly, because the Estate has failed to present legal authority or evidence sufficient to overcome discretionary immunity, Sgt. Giese is entitled to judgment as a matter of law.

## CONCLUSION

For the foregoing reasons and those already in the record, Defendants Eric Giese and the Village of Mt. Pleasant respectfully request that the Court grant their Motion for Summary Judgment and dismiss this action in its entirety, on the merits, with prejudice, and with such costs and disbursements that the Court deems equitable.

Dated this 25th day of April, 2022.

By: s/ Benjamin A. Sparks
SAMUEL C. HALL JR.
State Bar No: 1045476
BENJAMIN A. SPARKS
State Bar No. 1092405
Attorney for Defendants, Eric Giese and Village of Mt. Pleasant
CRIVELLO CARLSON, S.C.
710 N. Plankinton Avenue, Suite 500
Milwaukee, WI 53203
Ph: (414) 271-7722
Fax: (414) 271-4438
E-mail: shall@crivellocarlson.com
bsparks@crivellocarlson.com

16